In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00166-CR
______________________________


JAMES CALVIN TEMS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 31101-B


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

            James Calvin Tems appeals from his conviction by a jury for the offense of endangering a
child. Three cases were tried together. The jury assessed his punishment at 180 days' imprisonment
for the count in this case. The trial court sentenced Tems consistent with the jury's verdict. The
cases have been appealed separately, but have been briefed together.
            Because the briefs and arguments raised therein are identical in all three appeals, for the
reasons stated in Tems v. State, No. 06-04-00164-CR, we likewise resolve the issues in this appeal
in favor of the State.
            We affirm the judgment of the trial court.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          July 26, 2005
Date Decided:             August 30, 2005

Do Not Publish




nce is legally and factually insufficient to support the conviction. We affirm the judgment
of the trial court.
            Jerry Wayne Johnson, his wife, Mary Alvis Johnson, and his son, Jerry Wayne Johnson, II
(Jerry II), were at home together when Jerry was shot and killed. Mary has given several
explanations of what occurred. She told the first person to arrive at the scene, Gary Courtney, a
member of the volunteer fire department, that Jerry shot himself. Later, she told a deputy sheriff at
the scene that she did not know who shot him, but "they must have been waiting on him when he
came back in from outside." During the formal investigation, she gave three different statements to
Investigator Sherrie Pappas, wherein she alleged different factual scenarios leading to an accidental
shooting. Finally, at trial, she suggested that her son, Jerry II, killed his father and that she had been
protecting him by telling other versions of the occurrence. Jerry II testified that his mother told him
the shooting was an accident.
            1.         Is the evidence legally sufficient to support a jury determination that Mary
Alvis Johnson committed murder?
            In our review of the legal sufficiency of the evidence, we employ the standards set forth in
Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to view the relevant evidence
in the light most favorable to the verdict and determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d
1, 7 (Tex. Crim. App. 2000); Turner v. State, 805 S.W.2d 423, 427 (Tex. Crim. App. 1991). 
            Mary was charged with murder by intentionally or knowingly causing the death of Jerry by
shooting him with a deadly weapon, a firearm, or by intentionally, with the intent to cause serious
bodily injury, committing an act clearly dangerous to human life, namely shooting him with a
firearm, which caused his death. 
            It is undisputed that Jerry was killed by a .25 caliber handgun at his home on a night when
only he, his wife, and son were present. The scientific evidence is that the shot was fired from three
feet or further away from the deceased and no firearm residue was associated with the entrance
wound, all of which is incompatible with suicide. The handgun was fully functional and had a
trigger pull of seven and one-half to eight pounds. Immediately after the shooting, Mary told her son
that she obtained the gun at her husband's request and, when she sat down in the recliner by him, the
gun went off. She told Courtney that "Jerry has shot himself." Later that same morning, she told
Deputy Vic Thornburg she did not know how he got shot, but "they must have been waiting on him
when he came back in from outside." She told Deputy Thornburg that she had been firing a gun a
day or so earlier and inquired as to the length of time that gun residue would remain. Mary gave
three different statements to deputy Investigator Pappas, first saying that she heard a gunshot and
then found her husband shot. Second, Mary said she took the gun into the room because she thought
her husband had requested her to do so, and she put the gun by the loveseat arm by his head and then
saw a flash of light. She then told her son to call 9-1-1 because his father had accidentally shot
himself. Several days later, Mary made another statement to Investigator Pappas that her husband
told her to get the gun, and as she had the gun in her left hand and attempted to sit down, she fell and
the gun went off. At trial, Mary told a completely different version of that night's events. Before
the jury, Mary testified that Jerry II awakened her with the handgun in his possession and showed
her where the safety was located on the pistol, at which time she looked at him and said, "Son, what
do you want me to do? You want me to kill your daddy?" According to Mary, Jerry II then said,
"Now would be as good [sic] time as any." Mary then told her son, "I can't do this." She further
stated she took the gun into the front room where her husband was and put it on the floor. After
falling asleep in the chair, she was startled and saw her son pick up the gun and then saw a flash. 
Her son then said to her, "Go back to sleep. You're only dreaming," and tossed the gun to her. 
            A few months before Jerry's death, Mary had a very unusual conversation. Thomas Joe
Blake, an acquaintance of Jerry and Mary, testified that, during one occasion when he was drinking
coffee with Jerry and Mary, and after Jerry went to the restroom, Mary stated to him, "[I]f Jerry died,
I would come into a bunch of money" and it would be worth $10,000.00 to her if he died. This
occurred two or three months before Jerry's death. Later, she again made the same comment to
Blake. Blake told Jerry that he needed to be "real careful." 
            Mary also appeared to be urgently interested in Jerry's life insurance proceeds. Gena Marie
Bragg, an employee benefits specialist at Red River Army Depot, testified Jerry was an employee
there and had a life insurance benefit totaling $174,000.00. Three days after the death of her
husband, Mary came to Bragg's office and wanted to obtain the life insurance proceeds. She asked
Bragg to "write her a check" and became upset when the funds were not readily available.
            It also appears that some attempt was made to have the scene appear as a suicide. Courtney
testified that, when he arrived after being told "Jerry has shot himself," he found the firearm
underneath the deceased's hand with the hand over the gun and the fingers over the trigger.
            David Spence, the supervisor of the trace evidence unit at the Southwest Institute of Forensic
Science, testified he analyzed handwiping kits from Jerry, Mary, and Jerry II. In doing so, he was
looking for three elements: antimony, barium, and lead, which originate from the primer of a
cartridge case. All three people tested negative for gunshot residue, but there was an elevated level
of barium found on Mary's left palm. Further tests revealed that, when the weapon in question was
fired with the left hand, it did not deposit a sufficient quantity of the chemicals to determine
scientifically who shot the gun. 
            The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight
to be given their testimony. See Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). The
jurors are also entitled to draw reasonable inferences from basic facts to ultimate facts. Kapuscinski
v. State, 878 S.W.2d 248, 249 (Tex. App.—San Antonio 1994, pet. ref'd) (citing Dumas v. State, 812
S.W.2d 611, 615 (Tex. App.—Dallas 1991, pet. ref'd)). The standard of review is the same in both
direct and circumstantial evidence cases. See Geesa v. State, 820 S.W.2d 154, 156 (Tex. Crim. App.
1991). Intent is a fact issue for the jury to resolve. Intent and knowledge can be inferred by the
conduct of, the remarks of, and the circumstances surrounding the acts engaged in by the accused. 
Ybarra v. State, 890 S.W.2d 98, 109 (Tex. App.—San Antonio 1994, pet. ref'd); Parramore v. State,
853 S.W.2d 741, 745 (Tex. App.—Corpus Christi 1993, pet. ref'd). A culpable mental state
generally must be established by circumstantial evidence and may be inferred from the acts, words,
and conduct of the accused. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); 
Dues v. State, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982). 
            In this case, Mary has given numerous accounts concerning the death of her husband. In at
least two of these statements, Mary admits being in possession of the firearm when it discharged. 
At one time, she was quoted as saying that he shot himself. When Courtney arrived, the gun
appeared to be positioned near the hand and fingers of the deceased. Suicide is contradicted by the
scientific evidence that the shot was fired more than three feet away from the deceased into the back
of his head, resulting in no firearm residue at the wound entrance. There is strong evidence Mary
had previously discussed killing her husband. One witness reports that she indicated his death would
result in a large financial gain for her and that it would be worth $10,000.00 to her if he died. She
attempted to claim the rather large life insurance proceeds within three days of his death and became
upset when that was impossible. While the handwiping tests could not positively identify her as
firing the shot, it did show residue of barium on her left palm. The fact that she reported the incident
in so many differing ways provided to the jury a major issue as to her credibility. 
            The possibility of an accidental shooting is diminished, as laboratory testing revealed the
handgun in question required seven and one-half to eight pounds of pull on the trigger before it
would fire. After carefully reviewing the evidence in this case, we believe a rational trier of fact
could have reasonably concluded beyond a reasonable doubt that Jerry died as a result of a gunshot
wound intentionally and knowingly inflicted by Mary. 
            2.         Is the evidence factually sufficient to support a jury determination that Mary
Alvis Johnson committed murder?

            When reviewing a challenge to the factual sufficiency of the evidence to support the
conviction, we are required to determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding guilt beyond a reasonable doubt. Zuniga v. State, No. 539-02,
2004 Tex. Crim. App. LEXIS 668, at *20 (Tex. Crim. App. Apr. 21, 2004). There are two ways in
which we may find the evidence to be factually insufficient. First, if the evidence supporting the
verdict, considered alone, is too weak to support the jury's finding of guilt beyond a reasonable
doubt, then we must find the evidence insufficient. Id. Second, if—when we weigh the evidence
supporting and contravening the conviction—we conclude that the contrary evidence is strong
enough that the State could not have met its burden of proof, we must find the evidence insufficient. 
Id. "Stated another way, evidence supporting guilt can 'outweigh' the contrary proof and still be
factually insufficient under a beyond-a-reasonable-doubt standard." Id. If the evidence is factually
insufficient, then we must reverse the judgment and remand for a new trial. Clewis v. State, 922
S.W.2d 126, 135 (Tex. Crim. App. 1996).
            We have previously detailed the evidence supporting the conviction. Mary urges that
contravening evidence is that Jerry II committed the offense. There is evidence from Mary given at
trial indicating Jerry II shot his father. Of course, this evidence is directly contradicted by Mary's
many previous accounts of the events of that night, attributing her husband's death to suicide,
accident, or third persons, in addition to the contrary testimony of Jerry II. Mary urges that all her
other reports were given to protect her son.
            Also, there was antagonism between Jerry II and his father. This home was not one
displaying a great deal of family unity and support. Jerry II had written some checks on his father's
account and pawned some personal property of his parents, which led to physical confrontations
between Jerry II and his father. At one time, the father had broken the son's nose.
            Jerry II asked two persons how long gunpowder residue could be detected on a person's
hands. He also told his cousin that his mother was "going down for something that she didn't do." 
            Finally, it is conceded that, if Mary is convicted, Jerry II will obtain the life insurance
proceeds.
            Our role is to determine if Mary's conviction can stand in light of the contravening facts. Or
is this contravening evidence strong enough that the State could not have met its burden of proof?
            Mary's own testimony presents conflicting evidence to which we are normally to defer to a
jury's determination. The jury chose not to believe her. In this instance, the jury had a solid rationale
for finding her testimony not to be credible, given her many contradictory statements.
            While the antagonism between Jerry II and his father reached the physical confrontation level
at times, a jury was justified in concluding that this prior conduct never indicated that a threat of
death was involved.
            The question of Jerry II concerning the length of time gunpowder residue would remain on
the hands is somewhat inculpatory. However, it is not of such magnitude as the much more
damaging evidence against Mary.
            The statement of Jerry II to his cousin that his mother was "going down for something that
she didn't do" could be construed as his acceptance of her version of the events—that he believed
the shooting was accidental—as she reported to him and as he recounted on every occasion.
            It is true that Jerry II will recover the life insurance benefits if his mother is convicted. 
However, to conclude Jerry II was motivated to kill his father by the allure of life insurance proceeds
requires a determination that Jerry II concocted and implemented a scheme not only to kill his father,
but also to assure that the legal system convicted his mother—which we believe a jury could find
to be a highly unlikely occurrence. In fact, Jerry II has never testified that his mother committed this
murder, but has repeatedly stated she told him it was an accident.
            After considering all the evidence in a neutral light, we find a jury could have reasonably
concluded beyond a reasonable doubt that Mary was guilty of the murder of her husband.
            We affirm the judgment of the trial court.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          July 15, 2004
Date Decided:             August 12, 2004

Do Not Publish